Good morning. Sarah Stettler for the petitioner-appellant Rodney Berryman, Sr. Rodney Berryman, Sr.'s capital jury never heard that he has suffered from lifelong mental impairments and an intellectual disability. He was born two months premature at four and a half pounds and spent his first month in an incubator. His 17 year old mother, who had already had one child at that point, suffered from depression and could not care for little Rodney Berryman. His family was transient and moved often. His father was alcoholic, frequently violent, and regularly unemployed. There are frequent violent arguments between his parents on display for all the children to see. The government's brief lists a much of this evidence did come in. The incubator story didn't come in and the abuse of the alleged abuse by the two uncles didn't come in, but as best I can tell everything else that you listed should have come in did come in. So what's the brief? I mean we can focus on the two things, but is there anything else? Is government, I didn't see a retort to this in your reply brief. Do you disagree with the government's assertion that everything but those two items came before the jury? Yes, we do disagree with that. Your Honor, like many of the cases that have come before this court and before the US Supreme Court, trial counsel did something at the penalty phase. I understand, but why don't you list those things which you think the government, that were not those two that you now say didn't. So what are the things that did not come before the jury? Not whether they could have been done better or, you know, more expertly, but where is the government wrong? Well, thank you for your honor. For example, trial counsel knew that both Rodney Berryman and his younger sister, Ronique Berryman, had been physically, sexually abused by... I understand. I gave you those two. I said we can talk about those two. I'm just trying to clarify, is there anything other than the sexual abuse and the incubator, you know, the premature birth, that was not otherwise, was not put before the jury? Your Honor, it's not, with all due respect, just the fact that it was presented to the jury. I understand, that's a different question and we can talk about that one, okay. I just want, it's a factual question. You know, you may, you know, you can explain why it wasn't done well or whatever. But I'm just trying to find out because you didn't, the government lays it out very nicely in its brief and your reply brief doesn't address it. So I'm giving you a chance to address it. If you don't want to address it, that's fine. I'll just infer that you don't have anything to say. So the question is, is there anything other than those two items that did not come before the jury? So the items your Honor refers to are the premature birth, the first month in the incubator, the... Well, if first month in the incubator is part of the premature birth, I mean, that's what people go, babies go when they are prematurely born. They go into an incubator. So the, so there's the sexual abuse by the uncles. Is there anything else, you know, the abuse by the father, all the stuff you were starting to list that is in your blue brief that the government claims came before the jury? Is there anything else they've left out under those two items? Well, clearly the testing that the mental health experts suggested to counsel be requested from the trial courts, the EEG, alcohol-induced... That's in your second uncertified claim. You're talking about the PET scan and the alcohol-induced EEG and then the control EEG. Yes. So they had, I mean, since Judge Kuczynski is talking about a list of basically mitigation evidence the jury didn't hear, that's what I'm understanding. That's right. They heard that there were soft signs in the penalty phase, soft signs of organic brain disease, but not these test results, right? So does that go on your list for Judge Kuczynski's... Yes, that's what I was getting at. They knew about the brain damage? They knew, but they had no hard data to base that upon. So, and the prosecutor made light of this in closing argument, said that they didn't request the testing because the testing wouldn't have validated... Okay, I mean, fine, we can talk about it. Is there anything that wasn't mentioned? You know, I understand you could say they could have done more, you know, like the abuse by the father, all that. That came before the jury, right? Yes, well, the level of violence that they experienced and witnessed did not come before the jury, at least not the examples that were given in our briefing. So that's a question of degree, not of kind. I mean, they knew there was abuse, you say there should have been more. I'm sure that wasn't before the jury at all. And is there anything other than those two items that I mentioned? Well, in our view, essentially, trial counsel gave a good guy defense, which was Rodney Berryman is kind to women. He's a good person. If he was executed, it would have an impact on all the family members. So they listed him being slow in school, but they did not go into the details in the school record which show that he had a borderline IQ score of 75, that he had been put into special education classes in third grade at age 11 when he was reading at a first-grade level, and at age 11, generally, children should be in sixth grade. So while some of these things were introduced through the mental health experts, i.e. that he was slow and had trouble in school, they were not explained in a way. She just said there's more trouble in school than what was presented to the jury. What do you do about Pinholster? About Pinholster? I think that under our analysis... I remember Pinholster quite well, and there seemed to be quite a bit more in this court, and ultimately the Supreme Court said it was fine. You don't have to put on a perfect case, and you certainly don't have to put on a case that fine lawyers, and I do mean that with the benefit of hindsight and additional resources, can put on 25 years later. That's what the Supreme Court basically said. That's not the test. But since that time, the Supreme Court, as well as this court, has continued to find error in cases like this one, where trial counsel did some... presented some evidence of mitigation, but presented a very fragmented picture of the life of the defendant. In this case, I believe Pinholster does help us in the sense that it requires the court to review all of the information that was available to the state Supreme Court, including the state habeas petition, the funds request which were denied for funding to develop the claims. I don't recall they say it has to, or was that just simply the circumstance there? I believe Pinholster did hold that our focus needs to be on everything that was before the state court when they made their decision. Are you talking about Strickland prong one, or are you talking about Strickland prong two? It's one thing to talk about whether or not the counsel's performance fell below an objectively reasonable standard, which I thought was what Judge Kaczynski was asking about, and it sounds like you're answering a different question. You're going to prejudice. What about the first prong of Strickland? What about the fact that you don't have to get a perfect trial? If we're just looking at, don't we need to be concerned about whether the judgment call was reasonable? Of course, Your Honor. We do start with the performance prong of Strickland in which we look at whether it was a reasonable performance by trial counsel. Again, I think this court and the Supreme Court has held time and again that in viewing the, well, a good example is in this case, trial counsel failed to request the testing for the EEG, the mental health testing that would have supported the mental health experts' opinions. In this case, we don't have to wonder why. We often do have to wonder why something was or wasn't done, and I think that's always a caution for us. To be viewing this with 20-20 hindsight is, I think, one of the points Judge Kaczynski is making, or maybe isn't. It's one we talk about a lot and worry about. You can always look back and wonder what if. And then there's, as you know, all this case law about the deference we give to decisions made by counsel. But we're not left wondering here. We have the declaration of trial counsel about why he didn't go get the PET and EEG, right? Yes, and in addition to why he did not do that, which he candidly admitted in his declaration because he thought that the trial court would deny the request. So he didn't make the request. He just assumed that it wouldn't be authorized, and therefore he didn't make it. The Supreme Court has held time and again that that doesn't, as has this court, that that does not constitute reasonable performance in terms of your investigation. You need to actually investigate in order to make tactical, strategic decisions. Well, at the time of counsel, at closing argument, you just alluded to the fact that defense counsel at the time accused plaintiff, sorry, the state, accused the defense of not getting that test strategically. In other words, I think the argument was articulated that he didn't get the test because the concern was that might confirm that Mr. Berman didn't have brain damage, right? And the district court considered that in his motion, in his ruling, where he overruled the objection, having ordered the test on federal habeas, the federal district court considered that and talked about the fact that under the state rules that this could have all been done confidentially. There wasn't concern, shouldn't have been concerned, that he would have tipped his hand. Is that your understanding of the ruling at the time? Yes. So in other words, defense counsel could have obtained the test results at no risk is what I'm trying to get. I'm not articulating this well. Is that a correct statement? No, I perfectly understand, I agree, that trial counsel could have ordered the test, had them done confidentially, if they did not support the mental health experts' opinions in this case, that never would have been revealed to the jury. So that wouldn't have been a downside. What are the other arguments that we need to be concerned about when we talk about just prong one, Monday morning quarterbacking about that decision to not go get those test results? Well, as trial counsel conceded in his declaration in the state habeas exhibits, he didn't think that it would be authorized yet in the next capital case in Kern County that he handled, which was shortly thereafter, before the same judge he requested those funds and was authorized. And so his declaration was sort of a mea culpa. Well, right, but there's another reason that I think we need to discuss, and that is that at the time, and you have to do a little time travel on this one, but I think we'd be going back to 1988, right, the time of the trial. And if these test results wouldn't have been admissible, for example, then it would be tough to say that it would be objectively unreasonable for defense counsel not to go after them. And so the federal district court considered that as well. And my read of his order is that he didn't make a decision about whether or not these results would have been admissible as of 1988, but that he thought it probably would have been a situation where the concerns about this type of testing would have gone to wait rather than admissibility. But my question is, I want to make sure that I'm not missing something. Did the federal district court who ordered that testing ever make a decision about whether they would have been admissible results? I don't believe the district court made a decision upon whether it would have been admissible, but I can check on that and get back to you in rebuttal. I think the point, and I think under U.S. Supreme Court law, the range of information that's admissible as mitigating evidence is pretty wide, and I don't think there's much question that the test results would have been admissible at this time. Well, not if they're not deemed scientifically reliable. I mean, you can't bring in a Ouija board. Well, you laugh, but, you know, and you probably don't remember 1988 very well, but PET scans were just out. I mean, they had CAT scans about 77, I believe, and PET scans mid-80s when they came out, so it's not clear whether they were scientifically validated. Let me drill down a little bit more on this confidentiality question. When you said that the testing could have done confidentially, I'm just trying to understand what that means. You mean the prosecution wouldn't know that testing had taken place? If the defense lawyer asks for money for testing, then the prosecution knows that testing is going on, and it's awarded money, then the prosecution knows that the testing is going on, right? Not necessarily. The funds request is made ex parte and under seal so that defense strategies are not revealed. That's why I'm from Alaska, so I have to ask carefully about these questions to make sure I'm understanding California procedural law correctly, but I think in this case there was a request by defense counsel for some testing, and that's done on an ex parte basis. That was for blood spatter evidence, and my understanding is that the defense made the request, and that was done on an ex parte basis, but when the order issued, this is now from the federal district court, to actually produce this person for testing, Mr. Berryman, for testing, then the state objected, and then there was quite a bit of motion practice and there was an order that issued, is that right? That I would have to check on. That's the order that I'm referring to when the district judge there opined that this testing could have been obtained without a downside because he thought it would have been obtained confidentially, and if I've misunderstood that, that would be helpful to know, but I think he says that pretty clearly. But again, it's not the state court making that assessment, it's the federal district court, so if I've got it wrong, that would be helpful to know. My understanding is, Your Honor, that that request should have been made ex parte, that the state would not know of the request, whether or not it was granted, and what the results of the testing would be. Unless, of course, if the defense used it, all bets would be off at that point. But that was the request in federal court. What do we know about state court practice, whether the testing could have been done without an ex parte basis? And again, Your Honor, I believe that... Well, I know that. You think I haven't been listening? Sorry, Your Honor. I misunderstood the question. Maybe you weren't listening. There were tests done in the state court. Some tests. Was any kind of medical testing done? Psychiatrists examined him and the like? The psychiatrist examined him and interviewed him. Was that done ex parte? Were those things not disclosed to the prosecution? They were not disclosed until they were offered as witnesses. The orders authorizing it were confidential? Yes, Your Honor. In the state court? Yes. Okay. You sure about that? I believe so. Like I said, I will double check, but I believe that was the practice. Okay. So in this case, the certified issue regarding the ineffectiveness at the penalty phase, it's our argument that what counsel did was completely inadequate in light of this court's IAC. What do you do about the fact that Berryman didn't disclose his sexual abuse to anybody, didn't tell his lawyer, didn't tell his family until much later? What's a lawyer supposed to do if the client doesn't disclose? Well, again, I believe this supports our argument that trial counsel was ineffective because the sort of 101 basics of capital defense requires that trial counsel and his investigator put together a defense mitigation team, develop a relationship with the client so that the client feels safe. So we had to speculate that he could have gotten it out of his client. Is there some other way he could find out? I mean, his mother and, I mean, these things came out afterwards as far as family is concerned. Is there any evidence that if he had asked around, he would have found out about this alleged abuse? Yes. We have a declaration from both Lestine Bonte, the mother of Rodney Berryman, and Ronique Berryman, who both said that they told Bruce Binns, the trial investigator, and assumed that he told trial counsel about the sexual molestation of both Rodney and Ronique. But when they were put on the stand, no questions were ever raised regarding the abuse allegations, and no investigation was done from that point when it was revealed to the trial investigator. And when was it allegedly revealed? Do we have anything from the investigator himself? I believe we do have a declaration from Bruce Binns as well, and it was prior to the penalty phase. So it could have been investigated, it could have been presented at the penalty phase, and they had the information at the time. But again, I think it goes away from the penalty phase mitigation case that trial counsel was putting on, which was essentially the good guy defense. Rodney is a nice guy, he's nice to women, he's been hit by his wife and did not retaliate, therefore he could not have committed these crimes, which, of course, flies in the face of the conviction the jury just handed down for just that fact. So while there was a mitigation case presented, our argument is that it was woefully inadequate and did not cover the things that have been shown to actually impact a jury's resolution of whether or not someone should be put to death, and that is intellectual disability, brain damage, sexual abuse, trauma, exposure to violence. Do you think this is enough to overcome the double deference that we give in heaviest cases under AEDPA, deference to the trial lawyer, deference to the state courts? Well, I think in this case, because the state court never ordered a hearing, simply denied the habeas petition and the same claim, the IAC penalty phase claim, which was raised in the direct appeal in the opening brief, denied it essentially for not having developed the claims, and at the same time denied the request for funds to do just that. I don't think that the state court denial is entitled to that. The denial was at the state habeas stage? The denial was the direct appeal was fully briefed and submitted, as was the state habeas. They were both pending before the California Supreme Court. Following oral argument, they were both denied at about the same time. But I'm asking about the denial of the funds to investigate. That occurred right before the opinion was issued. But that occurred in the habeas phase. Yes. Why were there two motions pending before the California Supreme Court for the testing? There are two motions for the test. I just didn't understand why there were two motions pending. You mean the funding request? Right. Well, they weren't both pending. One had already been denied, and then more information. Oh, they were sequential? Yeah, they were sequential. Okay. Go ahead. I just want to make sure to follow up on Judge Kaczynski's question. It's at the habeas level. So the testing wasn't done in the state court. We're talking about the PET scan and the EEG when I say testing. I'm not talking about the paper testing. But the PET scan and the EEG weren't done. They were requested on state habeas. The argument was that the trial counsel was ineffective for not getting it, right? Okay. Then there was a motion filed at state habeas, and apparently two, but sequentially. And those were denied? And they were denied before the state Supreme Court denied the habeas petition? Yes? Yes. Okay. And before the direct appeal had been decided. But it was all in a very short span of time. Okay. That's what I missed. Okay. Thank you. I had hoped you would separate the two issues, and I started that. We keep going back and forth. But I want to make clear I understand the sequence of these things. The trial counsel failed to request funds. The doctors told him that he should get this additional testing. And he didn't think he would be able to do it. He did not make any effort to do it because he was mistaken about the fact that there were places that would do it outside of the county. And he thought they would not transfer him is what he said. And he testified that that was a mistake on his part. Okay. Then came the habeas. And at habeas, state habeas, where they were alleging ineffective assistance for failing to do this, they requested the court to make funds available so that they could have this testing, which their experts had recommended. And the state court denied the request for funds, denied the ability to get this test, and then ruled that because he did not have the evidence that he could have gotten if he'd had the test, that he would lose. So they denied him the opportunity to obtain the evidence and then ruled against him because he did not have the evidence. Because he didn't show that testing would make a difference. Is that right? It sounds like Your Honor sees the same problem that we see. Well, explain to me. Is there a constitutional right to funding for testing at state habeas? In order to develop claims? All the California- Is there a constitutional right to state funding for testing at habeas? I understand there is entitlement to certain funding for counsel and investigation and tests at the trial. I'm just talking about now state habeas. Is there a constitutional right to have the funding? I believe it's wrapped up in the right to counsel. So, yes, there is a constitutional right. In the case that supports that proposition? Your Honor, I'd like to reserve the remaining time for rebuttal, but I will get back to you on that. Okay. Thank you. Good morning, Your Honors. Brian Means for the respondent. Mr. Wong. I'm going to begin with addressing Claim 65, which is the sole claim that was certified for appeal. And then I will try to respond to some of the questions and concerns I think the court has raised about the PET scan and the funding request at the state court. There's been some dispute among the parties as to which adjudication by the state court is the appropriate adjudication for purpose of 2254 D1, an application of the Richter test for Claim 65, which is the family background evidence. There's some confusion, and I can see why counsel has taken the position they have. The claim was raised on direct appeal, and it was also raised on habeas, the same exact claim at almost the same exact time, and we normally don't see that. The claim, though, Claim 65, depended on extra record evidence, which they submitted when they provided their habeas claim to the California Supreme Court. Naturally, they didn't include that with their direct appeal claim, since in California, the California Supreme Court is limited to the record evidence on appeal and deciding claims. So they just made the bare-bones allegation, essentially, on family background, the Claim 65 issue, and the California Supreme Court, not surprisingly, responded with, you haven't shown us anything. Essentially, there's nothing in the record here. But this is the Catch-22 that Judge Reinhart was getting at, and I'm struggling with it, because the nature of the claim here is a Strickland claim. The nature of the claim is my lawyer didn't go get it. Right. When we're talking about the PET scans, well, actually, when we're talking about all this mitigation evidence that they say was missing, right, whether it's the PET scans or the family social history. So if the problem is some of it you can go get, so that's why there's some supplemental declarations. But for the PET scans and the EEG in particular, that's where I'm hung up. I'll just speak for myself. Okay. Because they said the problem is the lawyer denied me my Sixth Amendment right to counsel, to effective assistance, because they didn't go get this evidence, essentially. Correct. Didn't ask for it. And now I've got this motion pending, please let me go get it. And their argument is that the state court denied the funding to get that type of testing and then denied the Strickland prong to prejudice because they didn't show that the testing would have made a difference. Well, it does sound like a Catch-22 until you peel back the layers of the onion a little further, and it goes back to that same distinction I was making with respect to Claim 65, and that applies to Claims 16, 63, and 64, which is the PET scan and alcohol-induced EEG evidence. They had presented the claim both on direct appeal and on habeas. Sorry, and is the claim the claim? Is the claim the Strickland claim? The claim actually would be in the federal petition, they would be 16, 63, and 64. Right, so if you can just tell me, we're back to state habeas, and what they presented on direct appeal is my lawyer was ineffective for not getting this mitigation evidence. Yes, that and as well as not conducting the PET scans and the alcohol-induced EEG. Okay, so I'm including those. That's why we're miscommunicating. I'm including that in mitigating evidence. The California Supreme Court and petitioner in his habeas petition divided them up. Yes, that's right. So in looking at the California Supreme Court opinion, you'll see that the California Supreme Court in addressing the guilt phase claims addresses what is Claim 15 in the federal petition, which is they should have presented evidence of a mens rea defense in the guilt phase without any mention of the alcohol-induced EEG or the PET scan. Just based on what was presented in the guilt phase, or the penalty phase, excuse me, should have been presented at the guilt phase. Then they also argue in that same part of the application on direct appeal is that they should have also done the alcohol-induced EEG and PET scan. Because at the penalty phase, the jury did hear from Pearson Benson about the soft signs of organic brain disease, but they didn't have the testing confirmation, right? That is correct, although I would note that Dr. Benson was fairly confident in his diagnosis. And to quote, he says he, petitioner, does in fact have an organic brain disorder. We have to come back to that, but I just wanted to be sure that I'm understanding, I think, what you're telling me, which is that those two experts weren't presented in the guilt phase at the trial, only in the penalty phase. That is correct. Okay, thanks. So now the California Supreme Court has divided up these claims in addressing Claim 15, and it does that by just summarily denying it without any explanation with all the IEC claims. So that's just a summary adjudication under Richter. Then it goes on to address Claim 16, as denominated in the federal petition, and it does that by saying, you say that you should have presented this evidence of a PET scan and alcohol-induced EEG, but you haven't shown what the favorable results would be. And they gave that same explanation, almost verbatim, in addressing the penalty phase, where the same argument is made that they should have presented an alcohol-induced EEG and a PET scan in the penalty phase, both phases. So they're discussing two different portions of the California Supreme Court opinion. Just to keep it simple, this is complicated enough, just talk about the penalty phase for a moment. Fair enough. So what the California Supreme Court did was follow this established practice and said on direct appeal, essentially, I'm going to paraphrase because their language is you haven't shown us favorable results, something of that nature. What they're essentially saying is this is direct appeal. We're looking at the direct appeal record. There's no results here. That's what they call a catch-22, but that's not a catch-22. That's just established a practice that even this court applies. On direct appeal, you look to the appellate record. The California Supreme Court was presented with a claim, an IAC claim on direct appeal, that depended on extra record evidence, the PET scan results, the alcohol-induced EEG. California Supreme Court correctly recognized those test results are not in the record. Therefore, and again I'm paraphrasing because they use different language, but what they're saying is, look, this evidence isn't here. Your claim has to be denied. Essentially what they could have said was you need to go to habeas, but they already had done that. So normally the California Supreme Court will kind of advise petitioners, as you look over their long history of opinions, when a litigant mistakenly brings a habeas claim on direct appeal, they will say, well, this has to be done on habeas. In this case it already had been done. So when you say they had already done that, the pronoun in that sentence is the defense. The defense had already raised the same exact claim on habeas where it properly belonged. So on direct appeal, the California Supreme Court is merely saying, essentially we can't decide this claim on direct appeal. It's not your PET scan results and alcohol-induced EEG results are not in the appellate record, which of course is correct. So they simply denied it. On habeas, it was a summary denial. We don't know what possible reasons we have in their mind. I've got a lot of them why I can explain. This case is very much similar to People v. Guerrero, which is a case out of the California Supreme Court where a party had asked for an alcohol-induced EEG test. And the California Supreme Court was reviewing the trial court's decision not to grant them funding. Very similar to this case. And the California Supreme Court said, no, the trial court was right to deny you funding. You haven't shown that the person had this seizure or brain disorder condition while intoxicated at the time the crime was committed. And that same nexus, as the district court went to lengths to explain, is missing here. There's no connection between this purported seizure triggered by alcohol and the crime itself. You don't need any connection between the crime. I'm sorry? You don't need any connection for mitigating evidence. Well, that was their theory. No, that's not the theory. That's the law. We're talking about Eddings. You don't need a causal connection for getting the evidence that would be mitigating evidence at a penalty phase. Their argument, Your Honor, I'm saying. Who's they in your sentence? The defense. I'm sorry, Your Honor. I'll try to avoid the pronouns. That's okay. I'm just trying to follow you. The trial counsel defense theory was that he was less responsible. There was an explanation. Well, that was the guilt phase. But there was also a mitigation phase argument. Well, they didn't argue that at the guilt phase. They didn't argue that. It's a mitigation argument. Yes, it is. Right. I've got organic brain disease. I thought I said let's talk about it in connection with the penalty phase. That's correct. And you keep going to the guilt phase. Well, I'm not. What I'm trying to accurately portray to the court is that at the penalty phase, the defense was my guy is less culpable. Now, not for guilt. He did it. But as mitigation, there's some explanation. That's what it is. Yes. So they were trying to link it up. You don't have to. I understand that. If, for example, he had a brain disorder completely unrelated to the crime, no causal connection. Of course, that's mitigation. That can come in. But that's not what their theory was. Their theory, and correctly so because it's far more powerful if you can explain somehow a connection between the two, that he had this seizure at the time he committed the crime. That was their theory. That's what they were advancing. Counsel, I really beg to differ with you because there was a question about what happened that night because the crime was bizarre and out of character according to some of the experts. There's that, and that's what you're getting at. But they also made arguments about his cognitive abilities and his being a slow learner in school and being a special ed kid and so forth. And, of course, that's not all evidence that was contemporaneous with the murder. But it certainly went appropriately to the mitigation phase. Certainly. So I'm having a hard time understanding, if you want to get back to how it is, why it is, the state Supreme Court appropriately denied the funding at Habeas and then found no prong to prejudice on Strickland because he didn't have the testing. Well, as we had argued in our briefs, the evidence under the California Supreme Court's decision in People v. Kelly would have precluded the evidence because PET scans in the 1980s for determining anything other than, well, even seizure disorders were not authorized until the 90s. Okay, so can I stop you there? Of course. Just to make this quicker, if you can jump ahead, we have the benefit of the work done by the federal district court in this case in 2001 and said he looked back at 1988, and this is in response to the state's objection, to why are you ordering this testing. Right, correct. And the judge said, I'm not convinced that it was such voodoo science. In fact, Dr. Wu from UC Irvine's Brain Imaging Center said, I've done 25 of these in other forensic cases, and here are state courts where this has been admitted. And, of course, then there was the state's expert from UCSF Medical School that said, no, it shouldn't be deemed reliable. The point is the judge in the federal Habeas had that information and said, I'm not making a call on admissibility, but I am saying this would probably go to weight, not admissibility. In other words, it was a real dogfight, wasn't it? Some courts had admitted this evidence at that time. Well, I don't think so, Your Honor. I think, in fact, the decision cited by a respondent in People v. Protzman from the California Court of Appeal in 2001 had the same issue about the admissibility of PET scans to diagnose prior brain trauma and the court said that it was not accepted at that point. Again, this goes back to that same order. It's the March 31 order where there's a March 30 order, 2001. And some courts had admitted it and some courts hadn't. And the question was, are we looking for brain function? Are we looking for traumatic injury, or what are we looking for? And I am no expert, clearly, in that arena. But I guess I do take issue with your statement that I think what you're getting at is that it wasn't IAC to not go get these results in 1988 because they wouldn't have been admissible. And I find it significant that the federal district court begged to differ in 2001. Well, I think the record reflects this. Dr. Watson, I believe it was, had in his own declaration had pointed out that this evidence had not been recognized by any scientific or medical organization, including the American Academy of Neurology, Society of Nuclear Medicine, FDA, American College of Neurology. And, in fact, Dr. Wu himself, in a 1997 district court case, specifically stated that this particular evidence with respect to quantitative PET scan analysis in 1998 was new to him. It was the first time he had even been using it. But that's a different technique. What you're referring to now is a different technique. That's what he relied upon. And it's beyond the sort of scope of what we're going to do here today. I'm certainly not going to make a decision about admissibility today. But I'm just trying to call your attention to the fact, isn't it right that in 2001, when the federal district court considered these competing expert views about what was or was not going to be admissible, he didn't, his bottom line, as I read his order, is that it really would have gone to weight, not admissibility. Well, it came up two times. And I don't have a fresh recollection of which order you're referring to. Okay. So there's two. That's helpful for me to know. I'm just looking at the March 30, 2001 order where the judge is responding to the state's objection that he ordered the testing. Yes. And there's another order I should look at? Well, at that point, we had not retained experts. We had not actually done the independent work at that stage. What had happened by way of that? Yeah, they're in there. They're cited in there. They're cited by the judge. There's a Dr. Esther, I believe. Uh-huh. Yes. That was very early on. The parties had not really litigated the Kelly issue. It had come up. The court had, what had happened by way of background is the court had on its own ex parte ordered these tests to be done. Yes, I just explained that. Okay. And we had objected, saying you should have let us know that you're ordering us to transport this prisoner to another county for testing. In that context, we had said these tests also would not even be admissible. And you lost that fight, counsel. That's the order I'm just referring to. At that point, the court's like, you know, basically, let's go ahead and do the tests. Let's see what happens. I'm not real convinced at this point, but we'll pass on that later. Then, in responding to an opposition to an evidentiary hearing is when, at that point, we had retained several experts from Cedars-Sinai and UCLA Medical Center, a Dr. Neuer and a Dr. Watson, I believe is his name. Okay. And they were unequivocal on the state of scientific evidence and admissibility at that point. They are unequivocal. And the defense, I think that's exactly a fair characterization. They're just black-and-white expert, conflicting expert opinions. One is based just on Dr. Wu's own opinion, and our experts was based upon medical science and studies. I strongly disagree with that characterization. But be that as it may, for purposes of today, where does that leave us? I'm trying to get at it. I really am trying to get at your stricter claim because we're not going to get to the merits of that issue today. My point is just that it was a dogfight. It was a real question. And we're focusing on Strickland prong one and Strickland prong two, about not going to get that evidence. Your position is what? That he wasn't prong one deficient because it wouldn't have been admissible, I take it? Well, that kind of goes to both prongs. If it wouldn't have been admissible, it also would not have been prejudicial. And the district court actually kind of bypassed the prong one entirely and just went straight to prong two. Right. And said if it's necessary, it will get back to prong one, which it never found it to be necessary. So what do we do? Well, he was told by his experts that it was necessary. And he said he didn't ask for it because he wasn't aware that he could get it. He didn't think he could get courts to give him money to go out of the county. That's correct. And he said he was wrong about that. He really didn't know what he was doing. And that would seem to be ineffective assistance unless there's no prejudice. That is correct if, in fact, what he is saying is accurate. Now, he had relied upon two decisions, the Proctor and Holt decisions, but those really were different facts and circumstances. And from reading those decisions, they're dealing with different tests as well. And you can't tell for sure if, in fact, the trial court, just based upon the Proctor and Holt decisions, actually would have granted the test. In fact, No, no, I'm not saying whether they would have. I'm saying really you can't say it goes. Should he have made, should he have requested it? Yes. Under those circumstances, a reasonable attorney probably would have filed an application in what he got to lose, and it's confidential. And although it may come up in Part 1, it really doesn't matter. Because if you're right, then there's no prejudice, and so there's no ineffective assistance to start with. But you don't even have to worry about that. I mean, your argument is, well, yes, he didn't know what he was doing, which to me would make him ineffective.  There's no prejudice is your argument. Largely so. I would agree with that statement. But, again, because we don't know for sure what a trial court would have done. I have argued in my brief, and I won't go back over those points, that the petitioner hasn't shown that the Supreme Court's decision that he was not prejudiced was objectively and reasonably a fair-minded jurist. It wouldn't have reached that way. And one of the grounds that we argue is . . . He did ask for funding for the testing on habeas. They did ask for funding to the test on state habeas. Twice, correct. Twice. Right. And that was denied. Twice. And we don't know why. No. I mean, it's just a summary decision. Okay. But the question then becomes whether the fact-finding on habeas is due deference if he was not given funding with which to make a case. That's where we started. When he started the argument, that's where we left off with opposing counsel. To the extent they were making that argument, it would be way. That wasn't presented in the opening brief. And I don't believe it was even presented in the reply brief. I believe any reference to fact-finding defectiveness comes up later. But aside from that . . . I think it's baked in. I think they argue both that there's a D-2 fact-finding baked in there. The fact being, did this person have organic brain disease? And it's always there's a little tricky overlap there between D-1 and D-2. But it strikes me that there is a fact-finding D-2 issue. Let's skip over that. Let's assume that they did not waive it, just so I can get an answer to my question. I don't think it's a D-2 issue, Your Honor. I think it's a D-1 issue. I think what happens here is the California Supreme Court is assuming, based on what you're telling me, we want to do these tests because it will confirm what our Dr. Pierce and Dr. Benson are saying. And they're saying, kind of like in People v. Guerrero, that's not going to be enough. It's not going to demonstrate ineffective assistance to counsel. So why go ahead and authorize tests if they've already concluded that, even if they come out as petitioner hopes they will, as their doctors say they think they will, it won't be different, make a difference with respect to prejudice. So as we review it, we have to review it on the assumption that the tests would have been funded, would have come out positive, in any event, determine whether the decision of the California Supreme Court was unreasonable. Was objectively unreasonable under D-1. Assuming the tests came back as defense. As they said. Right, which is consistent with their prima facie showing standard in California Supreme Court. Why don't you speak to that because that really is the Harrington question. We don't know, so we have to X-ray through what the California Supreme Court didn't say. This is where I keep coming, yes. We're reviewing. We're reviewing. We're making certain assumptions about what they must have said. And we have to assume that, we have to assume that the tests would have come out positive, right? For our analysis here, that's correct. In looking at why they did not, yes. Not for any other purpose. So why don't you explain to me why that is then still a reasonable factual finding by California Supreme Court. Well, the California Supreme Court, assuming the tests would have come out as. We have to assume basically they presented tests and the tests came out as they had hoped, you know, right? That's correct. And then analyze the California Supreme Court decision to deny habeas under that statement. Well, this is something. Why is it still minimally reasonable under AEDPA? Well, a couple different points. First of all, I think. I always get worried when lawyers tell me a couple of points. It means basically what they're telegraphing is I don't have a good argument, but if you sort of take these two together. Actually, I have a list here, and I'm trying to condense it down if I can. Why don't you give me the one really just bad out of the ballpark with just one argument? Probativeness, it doesn't. First of all, again, by itself, this evidence, it was mitigating at trial. What they were seeking to show is that he was somehow less culpable, and this is at the penalty phase. Not culpable. Okay. We're at penalty phase. Less responsible. So the hypothetical before you launch, Judge Kaczynski's hypothetical, as I understand it, is it's okay to deny this testing because even if the testing could come back positive, meaning it confirms organic brain disease, right, it wouldn't matter in the mitigation phase because what? The weight of it would. The weight of it would. If there's no correlation between the testing results, it's, I think, much more powerful if they can show that he had a seizure. I'm sure. I'm not sure I understand. I understood Judge Kristol's question, but I didn't understand how you started to answer it. The weight of it would. I mean, she said because, and I thought you were giving an explanation, and you seemed to be. . . I just didn't understand what she was saying. A positive test result wouldn't have mattered at the penalty phase as mitigating evidence because what? Because why? Why wouldn't it have mattered? I'm saying the weight of it would not have been as much for a couple different reasons. The weight of the evidence, the powerfulness, the probative value of the mitigation evidence, would not have been as strong if they don't show a connection to the crime. Now, let me be clear. I'm not trying to say that mitigation evidence has to have a causal link to be mitigated. Because Judge Reinhart's not going to let you do that. He's going to talk about Eddings. No, absolutely not. No, Eddings forecloses that argument, and that's not one we've made. Well, I'm just trying to figure out, and really I'm not trying to give you a hard. . . These are terribly important cases, and I want to know why a positive test result confirming that this man had organic brain disease wouldn't have mattered. How do we know that wouldn't have mattered is mitigating evidence? That's my question. Let me put it a different way. At trial, they were . . . Why don't you answer Judge Kristol's question? That's what I'm going to do. Then you can put it a different way. At trial, they had essentially uncontroverted evidence, the so-called soft signs,  The prosecutor doesn't present any rebuttal evidence at all. You didn't call . . . The prosecutor didn't call an expert, but they cross-examined the heck out of the defense experts, right? It's not like they laid down and said, oh, yep, he's got brain disease. Yes, but I don't think they got anywhere. The best they got is in closing argument. The prosecutor made a comment of, well, perhaps you didn't get this test because it would have come out negative, or you didn't want to find out the results. But, in fact, they had their own expert testify at length about the circumstances of why that was true, and he went on to talk about that. They went to these hospitals, and no hospital would do it because of the circumstances of him being charged with a crime he was. So for the prosecutor to say, oh, I think they were afraid to do the test in light of the rebutted, uncontroverted evidence, that that was not true, that they actually had tried to do that. I don't think the jury would have found that particularly powerful. So... I'm sorry. Let's pretend that the evidence had been produced. Had they produced the evidence before they have an uncontroverted case, they got their star expert, Dr. Watson, a psychiatrist, saying he does, in fact, suffer from organic brain syndrome. Now they bring in the evidence. Now the prosecutor is going to bring in his own evidence. His own experts come in. Now usually in PET scans, that means you go to an independent facility like they did here, and you have an independent radiologist look at it like they did here. And Dr. Volk looked at the PET scan results, and he's not a party to this action. He's not an expert witness. He's just a doctor running the center, and he says these tests are normal. Now at trial, what if that had happened? And they bring in a Dr. Volk who's an independent expert and says I had no stake in this litigation. The test results are perfectly normal. Then the jury would have been allowed to decide, like they can decide any time they have competing expert testimony. Right, but you've got the prosecution's expert, an independent expert saying, hey, this is normal. You've got the defense expert saying, no, it's not. Now you've got a battle of the experts. Before they had the uncontroverted testimony of Dr. Benson saying he does, in fact, suffer from organic. That's the argument that the state made when the state wanted to get the order vacated requiring the testing. In federal district court, the state argued, hey, this testing shouldn't have been ordered because the state's, the defense expert was already able to testify on the existing evidence that Mr. Berryman had organic brain disease. And the defense experts came back with declarations saying, nope. What I meant was I can't confirm it. There's soft signs of this organic brain disease. There's all these indications of organic brain disease, but I need these tests to confirm it. To confirm it. To be absolutely certain in their diagnosis. But again, we have to compare it. You have less than one minute, and I've been waiting to try to ask you a question. Of course. And it may take you over by a minute, but two places in the Supreme Court decision. It says, and first with respect to the guilt phase, but it's similar to the penalty. Neither does the defendant establish ineffective assistance in defense counsel's asserted failure to investigate the mental state or to introduce evidence thereof. Here as well, he does not demonstrate that the investigation would have yielded favorable results. And hence cannot demonstrate that its omission adversely affected the outcome within a reasonable probability. So as I said, he didn't introduce the evidence that they were seeking to introduce. Because he didn't demonstrate that had they performed the tests, they would have yielded favorable results. Not that they would have been junk science, but they don't show that if they had done the test, that they would have gotten a favorable result. The second time they say it is on the penalty phase. Neither does defendant establish ineffective assistance in defense counsel's asserted failure to further investigate and then to introduce. He does not demonstrate that such further investigatory efforts would have yielded favorable results. Hence he cannot demonstrate that their omission adversely affected the outcome. Now, they're saying, it seems to me, that you can't demonstrate. They didn't demonstrate that if they had had the test, they would have had a favorable result. That's correct. And then they denied him the opportunity to demonstrate it by taking the test. Is there something wrong with that? That is not my interpretation of the California Supreme Court's decision. As I was arguing before, I think they're simply saying in so many words that this evidence is not in the appellate record. For example, they could have filed a motion for a new trial and they could have presented it. They're saying he didn't demonstrate that what he requested would have produced a favorable result. It could have been in the record. And then when they asked him, let us demonstrate it by taking the test, and they said no. The answer to that lies in the procedural posture in which the claim was raised. The claim, the response you're talking about was raised on direct appeal. The California Supreme Court was strictly limited to the appellate record. And based on the appellate record, they had not shown favorable results. If they had filed, say, example, a motion for a new trial and had presented the results, then the California Supreme Court on direct appeal could have then said, oh, look, I can now look at the appellate record and address your claim. But that did not occur here. Instead, they had to address the petitioner's claim on habeas. And in doing that, they looked at the funding request. Now, the funding requests were made in the context of habeas corpus for the results. They weren't made for direct appeal. They filed two applications, confidential applications, for funding to conduct these tests in the context of habeas corpus. It explicitly says that in its caption. That is where the claim was raised. And that is where they summarily denied relief. Not necessarily on the same ground we don't know it. And I say that all the time. We don't know why. We do not know why because it was a summary decision. Thank you, Your Honor. Thank you. Just a few points, Your Honor. Getting back to Judge Kaczynski's question that we left off on, I don't have a case for you, but we do believe that there are constitutional rights to effective assistance of counsel due process. I have no doubt you believe that. You probably believe there are all sorts of constitutional rights out there that are not affecting case law, and that's of general interest to me but not particularly relevant to this case. But what I was going to propose is that if it would assist Your Honors, we would be happy to provide supplemental briefing on that point. We'll let you know if you want me to. As well as the admissibility issue. We'll let you know if we want any supplemental briefing. Okay. And finally, as to the Strickland analysis performance prong on whether or not the testing would have been admissible, what we have from counsel is that wasn't the reason why he didn't request it. He simply didn't know that it would have been something that he could request. Well, it doesn't matter. If, in fact, it would have been admissible, his reason is irrelevant. And we don't know that it would not have been admissible. I understand that, but you can't have it both ways. You can't say, well, we know the real reason. I'm just saying. If, in fact, it's not admissible, then it doesn't matter. I mean, he could have not done it because he flipped a coin. Yes, and we don't know that. But what he says is it was strictly either laziness or incompetence. Well, I don't think he used laziness or incompetence. Those were my words. My understanding is that he came back in this declaration and said, I didn't know I could get it, and so I didn't ask for it. In fact, I thought I couldn't get it, and so I didn't ask for it. But Judge Wallace, who was the trial court judge, allowed it. In a couple of other cases, were those two cases, Holt and, forgive me, the other one is? Holt and Boling. Were those, they followed this case? Yes, in very short order, within years. I think two years. Were the test results admitted in those cases? They were. You still have another minute. You've answered my question. The last point is. You said two years? What's that? Two years? I believe it was exactly two years. I think the crimes happened pretty close in time. Talk about the two decisions. Holt, the sentencing was May 30th of 1990. The sentencing in this case was November 28th, 1988, and the sentencing in Boling was February of 1991. The crimes in both cases were mid-1989, so very close after the sentence in Berryman's case. To figure out whether the request would have been confidential, the district court judge cited California Penal Code Section 987.9. So do I just need to look back and make sure that I understand how that read as of 1988? That's what would have controlled? Exactly. Okay. Thank you, counsel. Thank you, Your Honors. This is argued will be submitted.
judges: Reinhardt, Kozinski, Christen